ELLIS, Judge.
As to the pleadings, facts and liability of the defendant to the plaintiff, see the case of Bergeron v. Highway Insurance Underwriters et al., La.App., 44 So.2d 140.
As to the quantum of damages in this case, the record reveals that the plaintiff was rendered in a more or less unconscious condition to such an extent that he was rather hazy as to what happened after the accident. He went to Dr. Ellender a short time thereafter where he received some first aid and Dr. Ellender diagnosed his injuries as follows: “Contusion of the head, anterior chest, both knees, wrists, cerebral concussion, laceration of the left infrapatel-la region, strain of both knees with possible injury to the semilunar cartilage.”
The treatment recommended was rest in bed, ASA, purgatives, limitation of fluid, X-rays, with the notation that he return to light duty after one week.
According to the testimony, Barrios at the time of the trial on January 24, 1949 was thirty-one years of age, married and had three young children, and was employed as a safety engineer which required him. to go to any place in the plant where men might be working. Barrios stated that it was necessary for him at times to climb ladders and that for perhaps • three weeks or a month he was unable to make any inspections, 'hold any meetings or climb anywhere.'
After the diagnosis by Dr. Ellender X-rays were taken of Barrios’ head, chest and knees and all were negative for fracture. There was a deep cut just below the left knee which he refused to have sutured as well as refused to take a tetanus serum due to the fact that he always reacted to such serum. According to Dr. Ellender, he reported to his office several times after the accident and there was general improvement except for the right knee which continued to be painful especially on movement, and upon examination the knee was still slightly swollen and upon forceful bending there was a crunching sensation and a tenderness under the knee and slightly locking on flexion and extension. As shown by previous report and as stated in a letter of January 28th, 1949, we are now more or less quoting, Barrios was not admitted to the hospital but was advised to rest in bed, was given a mild sedative and it was suggested that fluids 'be limited and a purgative was advised. “The latter two orders were suggested because of the cerebral concussion.” Dr. Ellender states that the complaint as to his knees persisted and he advised him to consult Dr. Battalora, orthopedic surgeon, which Barrios did, and Dr. Battalora concurred with Dr. Ellender in his opinion of an injury to the right external semilunar cartilage. In the record is a report from Dr. Battalora dated January 24, 1949 to the Fidelity & Casualty Company, one of the defendants herein, in which he stated that he had treated Barrios since May 31, 1948, and that on August 5, 1948 he operated upon his right knee and at that time “a tear was noted in the external semilunar cartilage of this knee. He progressed satisfactorily following this operation, although he still had some symptoms referable to his knee.” Dr. Battalora further stated that Barrios still complained of some pain in his knee in the patellar region and of cracking in the knee joint *145 which lead him to believe that in addition to the injury to the external semilunar cartilage he also suffered an injury to ' the patellar itself. At the time of this report he did not believe that Barrios was disabled fully for his type of occupation but that he did have some percentage loss of use of the right knee which he estimated at about 10% with a possibility that with continued use and over a long period of time the disability would increase and with the further possibility that he would have to have a secondary operation on the- knee for the removal of the patella which, if it had to be done, would increase the disability in his estimation to about 20% loss of use of the knee.
On January 25th, 1949 the attorneys for Barrios wrote to Dr. Battalora and in this letter propounded five questions to the doctor which the doctor answered in the order propounded in the letter on February 9th, 1949. The questions and answers are as follows :
“Q. In his present condition, would you normally expect Mr. Barrios to have some pain about his knee and some difficulty in using it? He contends that it sometimes locks or catches and throws him off balance. Is this, in your opinion, a sincere complaint? A. I would normally expect Mr. Barrios to have some pain in the right knee and some difficulty in using it. Due to the condition in the patella it is very probable that he does experience some catching in the joint, which could throw him off balance. This complaint in my opinion is sincere.”
“Q. What is your opinion about the possibility of his condition getting worse so that the patella will -have to be removed — that is to say, do you think there is a 50-50 chance that he will not have further trouble, or do you think that his chances of further trouble are greater than that? A. There is a possibility that the condition can progress and become worse. I would say that there is a 50-50 chance that he will not have any more trouble than he is presently experiencing. I make this estimate in view of the fact that- his occupation is not a heavy one, although it does require him to get about a great deal.”
“Q. In the event of the necessity of an operation, about how long would he be in the hospital and what would be the surgeon’s cost and the approximate hospital bill? A. If he had an operation done on the knee it would entail excision of the patella. If he was operated upon it would require a hospitalization period of approximately two weeks. The cost of this type of operation would be about $250.00 and the hospital bill would approximate about $150.00 to $175.00.”
“Q. Is there any danger that the loss of the patella would so disable Mr. Barrios as to prevent him from doing his usual work as Safety Engineer, which necessitates extensive walking; climbing; bending, getting around in corners- and under machinery, etc.? A. As far as disability following removal of a patella I would estimate that in the present instance if would cause a disability of not higher than 25% loss of use of the leg. I believe the patient could carry on his previous occupation. It would require a -total disability period of approximately three months.
“Q. If you still believe that after the operation, the disability would be 20% loss of use of the knee, how would this affect his leg; and is there any danger of that loss increasing? A. If he was operated upon I do not believe that the disability would increase higher than that stated. As far as removal of a patella affecting the leg I do not -believe that this would be of any serious import. The only residual that he would have would be some limitation in full flexion of the knee joint. I do not believe that the percentage of disability would increase.”
In the record, also, is a report dated May 11, 1948 from Dr. Shirley Lyons, New Orleans, addressed to Porteous and -Johnson, attorneys for the defendants, in which he stated:
“Examination revealed the following: Well developed and nourished male, in no acute pain, cooperative attitude; weight 170, height 5' 8”, blood pressure 160/110, pulse 80, temperature 98.6. Head presents *146 no abnormal scars; patient complains of tenderness to touch over left frontal area; neck normal; mouth normal. Heart and chest negative. Upper extremities normal. Right leg normal except for slight swelling of prepatellar region and patient complains of pain over anterior and lateral surfaces of right knee. Left knee shows slight tenderness, no swelling, small healed scar 1%" below left patella. Genitalia normal. Reflexes normal.”
“Conclusions: This patient suffered multiple injuries as described above. He probably suffered milk concussion from which he had recovered; also severe contusion of both knees — there remains some residual discomfort in region of right knee which prevents normal use of right knee at this time.”
On April 7th, 1949 Dr. Lyons made a further report to the attorneys for defendants, which was based upon another examination of Barrios on March 8th, 1949. This report shows that Barrios still complained of continued pain in the right knee and that .there was a satisfactory recovery after tjie operation by Dr. Battalora who-removed the external semilunar cartilage. Dr. Lyons stated that there was a minimum of disability resulting ' from -the operation arid that, in his opinion, the ten per cent disability estimated by Dr. Battalora was a proper estimate! The injury occurred in February 1948 and Barrios was able to perform his usual work at the time of this report, “some fourteen months later, with á minimum of disability, which is estimated at 10%. For this reason, we do not see the possibility that the right patella will require excision. The patient states that all other conditions from which he complained have just about disappeared. The headaches disappeared after about one year. * *' * ” This report reveals that Dr. Lyons again examined Barrios on March lSth, 1945 with a view of determining the amount of swelling in the knees and legs late in the afternoon (6:30 P. M.) but there was no abnormal swelling present. His conclusion was again to the effect that Barrios had made an excellent recovery and that the estimated total disability of the right knee is a minimum and 10% is within reason.
In our opinion, this man suffered a more serious permanent injury than Bergeron for in his type of work it was necessary for him to climb on, over and under machinery and to climb ladders and demonstrate safety methods which certainly made it necessary for him to have the full use of -his legs and knees. Also, his testimony reveals a mental anguish with regard to his condition or his ability in the future to continue to perform his duties, whereas such impression is not gained from the testimony as to Bergeron. He suffered headaches for quite a time after the accident as well as quite a bit of pain in his neck as a result of the blow to his head and pain as a result of the injuries to both legs. As a result of the operation, on his knee he remained in the Mercy Hospital in New Orleans six or seven days and it took him about four weeks to recuperate to a point where he could walk comfortably again during which time he did not work. Naturally, he suffered from the operation and he testified that for three days following the operation he suffered extreme pain.
Intervenor paid medical expenses for Barrios to Mercy Hospital in the sum of $318.65, and the Lower Court in addition, allowed $50.00 as attorney fees for services rendered intervenor, all of which is correct. We do not find from the judge’s reasons the basis of his judgment for $8,450.00 other than an award for special damages for the loss of his car, $450.00, personal possessions, $25.00, transportation charges in the course of medical treatment, wrecker service in the sum of $15.00, and cost of knee support in the sum of $10.00, $318.65 for medical expenses paid by intervenor and together with $50.00 as attorney’s fees. These items appear correct and are not contradicted, however, we believe that an award of $5,000.00 for permanent injuries, pain, suffering and mental anguish would be sufficient.
As thus amended the judgment of the District Court is affirmed.
ROBERT D: JONES, J., sitting ad hoc.