182 So.2d 809 (1966)
Charles PACE and Frank J. Caracci
v.
Phillip RIZZUTO.
No. 2026.
Court of Appeal of Louisiana, Fourth Circuit.
February 7, 1966.
*810 LeBrun, McGee & Karno, Wallace C. LeBrun, Metairie, for plaintiffs-appellants.
Cronvich, Ciaccio, Wambsgans & Perry, Philip C. Ciaccio, Joseph M. Perry, Jr., Metairie, for defendant-appellee.
Before YARRUT, HALL and BARNETTE, JJ.
BARNETTE, Judge.
Plaintiffs-appellants have appealed devolutively from a judgment rejecting their demands and dismissing their suit brought upon an alleged assumption by defendant-appellee and promise to pay an indebtedness of $4,784 owed to plaintiffs by third parties.
The case presents three issues, one of law and two of fact. The first question is whether the alleged oral assumption and promise to pay the debt of third persons is an exception to the parol evidence rule set out in Article 2278 of the Revised Civil Code of Louisiana. The second question, dependent upon an affirmative answer to the first, is whether in fact the defendant-appellee did assume and promise to pay the debt. Third, dependent upon affirmative answers to the first two, was there a consideration for the promise?
The defendant is the proprietor and operator of a bar and lounge known as "The Red Barn" in the City of New Orleans at a location formerly occupied by Angelo M. Selby and Joseph Buccola, who had operated a restaurant on the premises under the name "Shed Steak House". The plaintiffs are pinball machine and jukebox operators, who, in the course of their highly competitive business, lend money and assist patrons in financing restaurant and bar establishments in return for location concessions for pinball machines and jukeboxes in such establishments.
In April, 1962, the plaintiffs and Louis E. Angelo, vice president of New Orleans Cigarette Service, all creditors of "Shed Steak House", were instrumental in bringing together the defendant, Phillip Rizzuto, and Angelo M. Selby for discussion of a proposed sale by Selby[1] of the "Shed" to Rizzuto for the purpose of converting it into a bar and lounge.
During the course of conversations, there was discussion about Rizzuto's assuming the debts of the "Shed", including amounts claimed to be owed plaintiffs and Mr. Angelo's company. Whether or not an agreement was reached and an assumption actually made by Rizzuto will be discussed below.
Shortly thereafter, on May 11, 1962, the plaintiffs, Charles Pace and Frank J. Caracci, went with Rizzuto to a local bank and obtained a loan of $2,526.72. The note was signed by all three as co-makers. The purpose of the transaction was to provide Rizzuto with additional capital to be used in connection with his business venture. Upon failure of Rizzuto to pay the note at maturity, it was paid by Pace and Caracci.
On January 31, 1963, Pace and Caracci filed suit against Rizzuto alleging that they, as "guarantors and sureties" on the note of which Rizzuto was "maker", had paid it on Rizzuto's default and prayed for judgment for the full amount with interest, attorney's fees, and costs.
Judgment as prayed for was entered by default on June 13, 1963. Thereafter a timely motion for new trial was filed, and by stipulation of counsel it was agreed that a new trial should be granted. Judgment was entered accordingly on August 2, 1963.
Plaintiffs then filed a supplemental and amended petition in the name of "Charles Pace and Frank J. Caracci, D/B/A Palace Amusement Company". The suit had been brought originally by them jointly as individuals. In the supplemental and amended petition they abandoned completely their claims on the aforesaid note and alleged *811 instead an indebtedness of $4,784 based upon an alleged oral assumption by Rizzuto of the payment of that amount owed plaintiffs by Selby and Buccola as part of the consideration for the purchase by Rizzuto of "a bar and lounge business known as the Red Barn".
An exception of no cause of action filed on behalf of the defendant was overruled, and the case was tried on the merits. The exception of no cause of action is reurged here upon the authority of LSA-C.C. art. 2278, the pertinent portion of which is as follows: "Parol evidence shall not be received * * * to prove any promise to pay the debt of a third person."
We will first dispose of the legal question raised by the exception of no cause of action. Plaintiffs alleged in their petition:
"II.
"On or about May 11, 1962, defendant purchased a bar and lounge business known as the Red Barn, located at 7601 Chef Menteur Highway, in New Orleans, Louisiana, from Angelo Selby and Joseph Buccola for the sum of $11,000.00.
"III.
"As part payment for the price of the said sale, defendant orally agreed to assume the outstanding balance of $4784.00 which was owed by the said Angelo Selby and Joseph Buccola to petitioners herein."
These allegations bring the case within the exceptions to the parol evidence rule, and the prohibition imposed by Article 2278 does not apply. The judgment of the trial court overruling the exception was correct. Coreil v. Vidrine, 188 La. 343, 177 So. 233 (1937); Fabacher v. Crampes, 166 La. 397, 117 So. 439 (1928); B. & B. System, Inc. v. Everett, 34 So.2d 521 (La.App.2d Cir. 1948); Wallenburg v. Kerry, 16 La. App. 221, 133 So. 823 (2d Cir. 1931); Baskin v. Abell, 14 La.App. 601, 122 So. 133 (2d Cir. 1929).
In the Fabacher case, supra, the Supreme Court said:
"* * * the prohibition against the admission of parol evidence to prove a promise to pay the debt of another, does not apply (1) when the promise is made, upon adequate consideration, to the debtor himself, or (2) when the promise, even though made to the creditor, is given with the consent of the debtor, and the promisor has in his hands, or afterwards receives, money or property belonging to the debtor, to be applied to the debt. For in both these cases it is an original and direct undertaking by the promisor towards the debtor himself, and not at all a collateral undertaking to pay the debt of another. * * *" 166 La. at 401, 117 So. at 441.
In the Wallenburg case, supra, the court said:
"The weight of authority interpreting statutes of this kind is to this effect: That, if the agreement to pay the obligation of a third person is merely a collateral undertaking, it comes within the statute of frauds; but, if such agreement is independent, not made primarily to answer for another, but is impelled from pecuniary or business motives, accruing to the promisor, then it does not fall within the statute, and parol testimony is admissible to establish same." 133 So. at 824.
If in fact the defendant did purchase the business of Selby and Buccola, and did promise or agree orally to assume certain debts of the business as a part of the purchase price or consideration of the sale, parol evidence is as much admissible to prove that part of the consideration of the sale as any other element of consideration. In such a contract defendant would have become a primary obligor on the debt that Selby and Buccola owed plaintiffs and *812 would have received a pecuniary benefit or business advantage, a valid consideration, in return for his promise to pay. The consideration would have been the transfer of certain property and assets to him, and it must be assumed that, except for his promise to pay the debt, the transfer of property and assets would not have been agreed upon, or that a greater price would have been exacted.
We must now consider the factual question, whether or not defendant did purchase the business or assets of Selby and Buccola, doing business as "Shed Steak House", and if a promise to pay the debt owed plaintiffs was in fact a part of the consideration of the sale, and further if such consideration was received. These factual questions were resolved in defendant's favor by the trial judge without written reasons. It is so well settled in our jurisprudence not to require citation of authority that the findings of fact by the trial court will not be disturbed in the absence of manifest error. Not only do we not find manifest error, but the record before us clearly supports the judgment of the trial court.
The testimony of the witnesses reveals a few of the unconventional, if not bizarre, business transactions in which persons in this type of business frequently engage. Another case involving transactions among persons in this business was before us some months ago[2] and we find striking factual similarities, particularly deals involving substantial sums of money without written evidence.
We realize that our jurisprudence does not sanction reliance on speculation or conjecture to reach a decision.[3] However, it is difficult for the courts to apply laws which have evolved out of the experience of years in the course of conventional commercial intercourse to transactions among those who deviate from the accustomed and conventional methods of doing business. In such situations, courts must of necessity indulge more freely in the realm of speculation and assumption in the search for truth and the motives of the parties.
The explanation about the bank loan of $2,526.72, to say the least, is novel. One Nick Ricca is alleged to have owed this sum to Rizzuto as the balance of an $11,000 purchase price of a bar business Rizzuto had sold him. Rizzuto needed this amount and more to open a new bar and lounge. Ricca, for some undisclosed reason, was unacceptable to the bank as maker of a note, presumably even with the endorsement of Pace and Caracci. Ricca was a patron of Pace and Caracci and was indebted to them. It was agreed among them that Rizzuto would make the note at the bank with Pace and Caracci as guarantors and co-signers. Rizzuto got the money and Pace and Caracci substituted themselves as creditors of Ricca for this additional amount in the place of Rizzuto. Hence Rizzuto felt no obligation to the bank and did not pay the note on maturity, for, as he says, he merely got money which was owed to him.
Caracci confirmed the foregoing transaction but never did explain why he and Pace would substitute themselves as creditors of Nick Ricca, whose credit was admittedly worthless, for this additional amount, when they might have made a loan directly to Rizzuto. In either event both Ricca and Rizzuto would be under obligation to them for pinball and jukebox concessions.
On cross-examination Caracci acknowledged that Ricca was to pay the amount of the note, that it was charged to his account, and that he made payments. He said:
"A We have acknowledged Mr. Ricker [Ricca] was to pay this, yes, but we have notMr. Rizzuto is an endorser and that is why we had Mr. Rizzuto endorse the note *813 and not Mr. Ricker [Ricca]. Mr. Ricker [Ricca] is shown nowhere on the note. Mr. Rizzuto is shown on the note, but we put it on his [Ricca's] account to be paid by him, which is so often done in my business, as you well know.
"Q You put it on his account to be paid by him, because of the fact you all were making this loan to Mr. Ricker [Ricca] to pay off what he owed Mr. Rizzuto; isn't that true?
"A No, I wasn't making a loan to Mr. Ricker [Ricca] at all, I was making a convenience for Mr. Rizzuto, because I wouldn't lend Mr. Ricker [Ricca] four cents again and at that time I wouldn't lend him any more.
"Q Actually isn't it a fact that simultaneously with signing this note you all added the amount of this note to Mr. Ricker's [Ricca's] bill?
"A Definitely."
Following this testimony he was asked why, if this was Ricca's obligation and Ricca had made payments, they sued Rizzuto on the note at all and then for the face amount. His explanation was that it was his lawyer's mistake but failed to explain how the note got in the lawyer's hands for suit.
On the alleged assumption by Rizzuto of the $4,784 owed plaintiffs by Selby and Buccola the testimony discloses that prior to the note transaction on May 11, 1962, during the month of April, there were discussions among Pace, Caracci, Angelo, Selby, and Rizzuto relative to the purchase by Rizzuto from Selby of the "Shed Steak House" at 7601 Chef Menteur Highway. There is no doubt that it was proposed that Rizzuto assume debts of the "Shed" owed to plaintiffs and Angelo, or his company. Their motive for encouraging and assisting Rizzuto in the purchase is obvious. Apparently they knew that the "Shed" was in financial distress and about to fail, leaving them with unsecured claims. (They had no chattel mortgages or other security.) It was to their interest to obtain a promise or assumption of the debts before it was too late. Furthermore it was to their interest to continue their pinball, jukebox, and cigarette machine concessions at that location.
It is entirely probable that Rizzuto had agreed to such assumption upon sale or transfer of the business from Selby to him. But the plan was exploded before it materialized. The owner of the premises at 7601 Chef Menteur, lessor of Selby, filed suit for two months' past due rent and for all future rentals due under the lease, totaling approximately $6,000. He seized all furniture and fixtures and padlocked the premises, putting the "Shed Steak House" and Mr. Selby out of business. No assets were salvaged by Selby, the business was closed, there was no good will, and he had nothing to sell or transfer.
At this point Rizzuto broke off all negotiations with Selby, Angelo, and the plaintiffs and negotiated a lease of the premises with the landlord, Harold C. Leibe, through his attorney, John F. Meyer.
Mr. Meyer's testimony is clear and convincing. He testified that suit was filed by him for the lessor, Leibe, against Selby on April 25, 1962, for two months' past due rent and for the balance due under the terms of the lease, totaling approximately $6,000, plus attorney's fee. Seizure under a writ of sequestration was effected by the sheriff on April 26, and the "Shed" was padlocked. The items of equipment and furnishings which were subject to chattel mortgage were released to the mortgage claimants. The air-conditioning equipment was released by Selby by dation en paiement to the mortgagee. Rizzuto negotiated a purchase agreement of this equipment from the mortgagee. Selby released all equipment and fixtures, including a bar, to the lessor upon consideration of cancellation of the lease and dismissal of the suit. On May 15, 1962, Rizzuto paid Leibe, the lessor, through his attorney, *814 Mr. Meyer, the two months' rent due, attorney's fee, and all court costs, totaling $1,075; and a new lease of the premises was executed to Rizzuto with such equipment and fixtures as were left therein for a term of two years beginning June 1, 1962. Rizzuto changed the name and nature of the business and acquired new permits and licenses.
In view of the very evasive testimony of Rizzuto relative to the alleged assumption and promise to pay Selby's debt to plaintiffs and the testimony of Pace, Caracci, Angelo, and Selby that he did agree to the assumption, it must be held that the preponderance of the evidence supports the conclusion that such agreement was made. Plaintiffs thereby became the creditor beneficiaries of a commutative contract between Selby and Rizzuto. LSA-C.C. arts. 1890, 1902. The consideration for Rizzuto's promise was the promise to him by Selby to transfer a business with all its assets, tangible and intangible. Because of the intervention of the landlord, whose suit put Selby and the "Shed" out of business and stripped him of all assets, he was unable to transfer or sell the business. He was in no position to assign the lease or transfer the "location". There was never any payment, nor instrument executed, nor other evidence of purported transfer or sale of anything for the simple reason that Selby had nothing to sell or transfer. Thus the consideration for Rizzuto's promise failed, and plaintiffs cannot maintain an action on his obligation under the contract. Union Bank v. Bowman, 9 La.Ann. 195 (1854); Smith, Third Party Beneficiaries in Louisiana: The Stipulation Pour Autrui, 11 Tul.L.Rev. 18, 57 (1936). See Moriarty v. Weiss, 196 La. 34, 198 So. 643 (1940).
No other consideration was alleged or proved. Plaintiffs do not contend, nor could they, in view of Caracci's explanation of it, that the note transaction was consideration for the assumption and promise to pay. Furthermore it would be too incredible to believe that Rizzuto would have promised to pay $4,784 in consideration for receiving $2,526.72 which was already owed to him. He referred to this as money belonging to himself.
Plaintiffs contend in their brief that defendant's reliance on failure of consideration cannot be considered because defendant did not set it forth affirmatively in his pleadings as required by the Code of Civil Procedure. LSA-C.C.P. art. 1005. However, much evidence relating to the failure of consideration was admitted without objection, and hence, it is to be considered in all respects as if it had been pleaded. LSA-C.C.P. art. 1154. Davis-Delcambre Motors, Inc. v. Simon, 154 So.2d 775 (La.App. 3d Cir. 1963).
The judgment for defendant rejecting plaintiffs' demands and dismissing their suit is affirmed at their cost.
Affirmed.
NOTES
[1] Selby's partner Buccola had previously sold his interest to Selby and apparently had no direct interest in the proposed sale to Rizzuto.
[2] Andras v. Trouard, 170 So.2d 209 (La. App. 4th Cir. 1964).
[3] Guillory v. New Amsterdam Cas. Co., 244 La. 225, 152 So.2d 1 (1963); White v. Johness, 237 La. 1074, 112 So.2d 717 (1959).